**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **CHRISTOPHER E. GONZALES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14 CV 0377** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant,** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant, Christopher Gonzales ("Gonzales" or "Claimant"), has brought a

motion for summary judgment (Dkt. 16) seeking judicial review of the final decision of

the Commissioner of Social Security (the "Commissioner").  The Commissioner denied

Claimant's claim for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under the Social Security Act (the "Act").  The Commissioner has filed a

cross-motion for summary judgment (Dkt. 21), asking the court to uphold the decision of

the Administrative Law Judge ("ALJ").  The court has jurisdiction to hear this matter

pursuant to 42 U.S.C. § 405(g).  For the reasons set forth below, Claimant's motion for

summary judgment is granted in part and the Commissioner's motion for summary

judgment is denied.

**I.     BACKGROUND**

    **A.     Procedural History**

On January 14, 2010, Claimant filed his application for DIB, alleging disability as

of January 8, 2009 due to bipolar disorder. (R. 31, 97-98.) Claimant subsequently filed an application for SSI. (R. 15.) His date last insured for purposes of his DIB application was March 31, 2009. (*Id.*) Claimant's claims were denied initially and upon reconsideration. (R. 27-31, 40-43.) On March 5, 2013, claimant appeared with counsel at a hearing before the ALJ. (R. 553-86.) A vocational expert also testified at the hearing. (*Id.*) On April 18, 2013, the ALJ issued a partially favorable written decision, in which he concluded that claimant was disabled under the Act as of May 28, 2012, but had not been disabled prior to that date. (R. 11-24.) The Appeals Council denied claimant's request for review, and the ALJ's decision became the final decision of the Commissioner. (R. 4-7.) This action followed.

### B. Medical Evidence

#### 1. School Records

Claimant submitted school records documenting the problems he faced in school. The records reveal that he was closely monitored in middle school and high school for various academic, behavioral, and interpersonal problems. (R. 391-532.) He was treated by a psychiatrist at a young age due to acting out, depression, and suicidal threats. (R. 425.) During one behavioral incident, Claimant admitted to having thoughts of stabbing one of his classmates with a pen and hurting the "popular" kids. (R. 468.) In 1998, he was transferred from a supported level of services to a self-contained level of services. (R. 463.) Ultimately, Claimant graduated from an alternative high school. (R. 561.)

#### 2. Treating Physicians

According to a letter dated October 4, 2012, Claimant has been treated by Dr. Katherine Camilleri since 2003 for bipolar disorder. (R. 533.) Records from actual treatment with Dr. Camilleri date back to 2006. (R. 316-27.) In April of that year, Claimant denied suicidal or homicidal ideations, but was feeling very low and angry, and was suffering from "racing thoughts." (R. 327.) He explained that he was recently off his medication and admitted that his mood was usually better when he was taking his medication. (*Id.*) Dr. Camilleri's assessment was noted as "296.7," (which corresponds to bipolar disorder in the DSM IV), and she recommended an increased dosage of Trileptal. (*Id.*) At a follow-up appointment a few weeks later, Claimant had been compliant with his medication and his mood was "a lot better." (R. 326.) He was seeing a therapist at the time. (*Id.*) The next month, Claimant was frustrated with his therapist and feeling irritable. (R. 325.) He sometimes wondered, "what's the point?" (*Id.*) Dr. Camilleri again recommended an increase of Trileptal. (*Id.*) By August 2006, Claimant had been let go of his job and was feeling "low." (R. 324.)

The record is silent until Claimant returned to see Dr. Camilleri a year later. (R. 323.) He complained of mood swings and anger issues. (*Id.*) He denied suicidal ideations, but sometimes wondered if he even wanted to wake up in the morning. (*Id.*) He had run out of Trileptol "a long time ago." (*Id.*) In October 2007, Claimant reported feelings of anger, depression, and anxiety, among other things. (R. 322.) He did have a part-time job. (*Id.*) He had not started the medication Dr. Camilleri had previously prescribed. (*Id.*) Dr. Camilleri described him as alert, casually groomed and restless, and noted a logical thought process. (*Id.*) She recommended Lamictal. (*Id.*) The following month, Claimant had not noticed a difference from the Lamictal, but others

around him had.  (R. 321.)  He admitted that he had not been taking the full dose.  (*Id.*)

Dr. Camilleri documented that Claimant was alert, cooperative, and exhibited good eye

contact and a "good range/intensity of affect."  (*Id.*)  By December 2007, claimant had

been out of meds for a few weeks, but admitted that they were helping.  (R. 320.)  His

affect was normal, and his thought process logical.  (*Id.*)  In February 2008, Claimant

again told Dr. Camilleri that the Lamictal "really works," and his mood had remained

stable, despite some significant stress related to his job.  (R. 319.)

Claimant did not return to see Dr. Camilleri until March 2009 when he had

"insurance that allowed him to be seen" again.  (R. 317.)  At that time, his mood was low

and he was feeling lonely.  (*Id.*)  He felt like he "[didn't] fit in."  (*Id.*)  Dr. Camilleri

recommended an increase of Lamictal.  (*Id.*)

The record is again silent until January 2010, when he repeated similar

complaints.  (R. 316.)  He denied suicidal ideations, but wondered if "life [was] worth it."

(*Id.*)  He exhibited a depressed affect.  (*Id.*)  He had run out of Lamictal, but Dr.

Camilleri prescribed it again.  (*Id.*)  The next month, Claimant reported he had re-started

Lamictal with no problems.  (*Id.*)  His mood was improving and he was sleeping and

eating well.  (*Id.*)  No significant changes were noted at his next appointment in April

2010.  (R. 385.)  Claimant appears to have missed his next two appointments with Dr.

Camilleri.  (R. 384-85.)

In October 2010, Claimant again reported that Lamictal had helped his mood.  (R.

383.)  He denied audio/visual hallucinations and delusions.  (*Id.*)  In February 2011,

Claimant reported he had previously run out of medicine, at which time his mood

worsened.  (R. 382.)  He felt much better when he started taking it again.  (*Id.*)  He exhibited a normal affect and thought process.  (*Id.*)

By May 2011, Claimant felt his mood had been "unstable" and he was frustrated with his financial situation.  (R. 381.)  He had been off Lamictal for two weeks.  (*Id.*)  He reported he had jobs delivering papers and substitute teaching.  (*Id.*)  He was feeling only "so-so" because of his work schedule.  (*Id.*)  Apparently, the day prior to his appointment, Claimant had acted aggressively on the phone with Dr. Camilleri's office staff.  (*Id.*)  Dr. Camilleri started him on Lamictal again.  (*Id.*)

On February 24, 2012, Claimant was taken to the hospital after he sent his sister a message saying, "Sorry I have failed" and then did not answer her phone calls.  (R. 344.)  Claimant told the examining physician that he had been struggling financially and had been unable to continue treatment with Dr. Camilleri.  (R. 344-45.)  He said that he had texted his sister because he did not know how to get the help he needed and he knew she would help him.  (R. 345.)  He denied suicidal and homicidal ideations at the time, but admitted to such thoughts in the past.  (R. 345.)  He was lonely and unhappy with his substitute teaching job.  (R. 346.)  He admitted to getting easily frustrated and anxious.  (*Id.*)  He was "very edgy and mad" at the lack of success he has had.  (*Id.*)  He lacked a support system of family or friends.  (*Id.*)  Claimant was given referrals for follow-up counseling and outpatient treatment.  (R. 347.)

Claimant returned to see Dr. Camilleri in August 2012, at which time his condition had significantly worsened.  (R. 380.)  He was having a hard time relating to others, was angry, irritable, anxious, and feeling low.  (*Id.*)  He had been unable to work and had failed an online course he attempted.  (*Id.*)  He had tried substitute teaching, but found it

frustrating and upsetting. (*Id.*) He denied suicidal or homicidal ideations, though he felt hopeless sometimes. (*Id.*) His mood was low and his affect congruent. (*Id.*) Dr. Camilleri re-started Lamictal because Claimant felt that he could afford it. (*Id.*) However, he did state that he could not afford to see Dr. Camilleri more than every two to three months. (*Id.*)

In support of Claimant's application for benefits, Dr. Camilleri submitted two letters and a medical source statement. In her first letter, dated October 4, 2012, Dr. Camilleri states:

> I am writing to you to review your condition and ability to work. I have been treating you since 2003. You have been treated for bipolar disorder. At this point I feel you have had fairly chronic symptoms. I feel that these symptoms impede your ability to hold a job and support yourself and I feel your symptoms are disabling.

(R. 533.)

In the medical source statement, dated February 21, 2013, Dr. Camilleri documented that Claimant had limited, but satisfactory limitations in his ability to remember work like procedures; understand, remember, and carry-out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work related decisions; ask simple questions or request assistance; be aware of normal hazards and take appropriate precautions; and adhere to basic standards of neatness and cleanliness. (R. 534-35.) She found he was seriously limited in his ability to maintain attention for two hour segments; maintain regular attendance and be punctual within customary usually strict tolerances; perform at a consistent pace without an unreasonable number and length of rest periods; and understand, remember and carry-out detailed instructions. (*Id.*) Claimant would be unable to meet competitive standards

6

in the following categories: working in coordination with or proximity to others without being unduly distracted; setting realistic goals or making plans independently of others; and maintaining socially appropriate behavior. (*Id.*) According to Dr. Camilleri, Claimant maintained no useful ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; deal with stress of semiskilled and skilled work; and interact appropriately with the general public. (*Id.*)

Dr. Camilleri based her conclusions on the fact that Claimant tends to become anxious and defensive, particularly when confronted with criticism. (R. 535.) She explained that this leads to problems with co-workers. (*Id.*) She further explained that Claimant finds stress to be generally upsetting and distracting. (*Id.*) In addition, Dr. Camilleri concluded that Claimant would find a number of demands of work to be stressful, including speed, complexity, deadlines, working with other people, dealing with supervisors and the public, and a fear of failure at work, among other things. (R. 536.) According to Dr. Camilleri, Claimant's impairments and treatment would cause him to miss more than four days of work per month and his impairments were consistent with the limitations she assessed. (*Id.*)

Dr. Camilleri followed up with another letter, dated March 20, 2013, describing Claimant's symptoms and limitations in more detail. (R. 539-40.) She explained that he had suffered from periods of depression, psychotic symptoms, decreased energy, anxiety, impaired impulse control, suicidal thoughts, unstable personal relationships,

impulsive behavior, feelings of worthlessness and hopelessness, and emotional withdrawal or isolation. (R. 539.) His symptoms have varied over the years and his lack of funds and insurance have left him without access to necessary psychiatric care and medication at times. (*Id.*) According to Dr. Camilleri, Claimant presents himself in a confident matter and with an intensity that is difficulty to describe. (*Id.*) "He can stare or gaze with a look of challenge about him," and the response by others can be a threatening feeling. (*Id.*)

Regarding Claimant's ability to work, Dr. Camilleri stated that he could understand and learn skills that would help him work. (R. 539.) However, his symptoms "make his success in maintaining employment highly unlikely." (*Id.*) Specifically, his thoughts that others are judging or demeaning him are overwhelming and have caused him to become psychotic in the past. (*Id.*) He exhibits poor impulse control and his anger and suspicion can lead to an aggressive and threatening posture. (*Id.*) Though Dr. Camilleri had not heard of Claimant ever harming anyone, she understood why his threatening posture would lead to concerns that he may do so. (*Id.*) Unfortunately, as Dr. Camilleri explained, Claimant does not understand this cause and effect and, as a result, has trouble understanding why he cannot maintain employment. (*Id.*) Claimant has made many efforts to work that have been unsuccessful. (R. 540.) In Dr. Camilleri's opinion, Claimant is unable to work and his prognosis is guarded. (*Id.*)

Claimant underwent a psychological evaluation with Dr. James Jorgenson on January 14, 2013. (R. 302-05.) He presented himself in an appropriate manner, though he had a "piercing gaze" throughout the evaluation, which Claimant acknowledged made others uncomfortable. (R. 302.) He described a difficult childhood at home and

at school.  (R. 302-03.)  He also described a history of visual and auditory hallucinations. (R. 303.)  Claimant discussed his hospitalization in 2012 when he was severely depressed and had suicidal thoughts.  (*Id.*)  When he tries to work, he becomes anxious and verbally aggressive, which has led to a few school districts not asking him back as a substitute teacher.  (*Id.*)  Claimant admitted to severe situational depression, and stated that the times he was fired from his various jobs worsened his depression.  (*Id.*)  During one period of depression, he did not call or text message anyone for twenty-five days.  (*Id.*)  He has few friends and spends most of his time alone.  (*Id.*)  Claimant stated that he has previously taken Lamictal, but explained that it does not always work and that he cannot always afford it.  (*Id.*)  He admitted to homicidal thoughts at times, but stated that they are transient and disappear quickly before he begins any planning. (*Id.*)

Dr. Jorgenson described Claimant's mood and affect as subdued and withdrawn, though his mental facilities appeared intact.  (R. 303.)  Upon psychological testing, Claimant exhibited above average levels of anger, potential for aggressiveness, and perceived level of social support.  (R. 304.)  His results also revealed he is likely to be "impulsive and emotionally labile, to feel misunderstood by others," and to find it difficult to maintain relationships.  (*Id.*)  He scored high on scales of anxiety related disorders, paranoia, hyper vigilance, and resentment.  (*Id.*)  Overall, his scores placed him in a category of individuals who are "probably having difficulty in concentrating and making decisions, and their preoccupations and bitterness are likely to impair their ability to think clearly." (*Id.*)  Among other things, such individuals may experience "brief psychotic episodes during which their judgment deteriorates markedly."  (*Id.*)

Dr. Jorgenson assessed depression, social anxiety and bipolar disorder with psychotic tendencies.  (R. 304.)  He documented claimant's GAF score as 50, and noted that was likely the highest score in the last year.  (*Id.*)  On the whole, Dr. Jorgenson found that although Claimant is above average in intelligence and can understand and carry out instructions, he has serious difficulty responding to supervision, co-workers, and customary work pressures.  (*Id.*)  Dr. Jorgenson opined that these difficulties would continue indefinitely despite Claimant's efforts and will severely impair his ability to obtain and maintain a work relationship.  (*Id.*)

### 3.  Agency Consultants

On April 28, 2010, Donald Cochran, Ph.D, indicated that he was unable to complete a Psychiatric Review Technique due to insufficient evidence.  (R. 329-42.)

On July 18, 2012, Dr. Kelly Renzi, Psy.D., performed a consultative evaluation of Claimant.  (R. 353-57.)  She did not have any objective medical or psychiatric records available for review at that time.  (R. 353.)  Claimant told Dr. Renzi that he suffered from bipolar disorder that had worsened over time.  (*Id.*)  He said that he experiences visual and auditory hallucinations at least once a week that coincide with intense emotional feelings.  (*Id.*)  The only way he knows how to handle his emotions is to talk to himself, which often makes those around him uncomfortable.  (*Id.*)  Claimant explained that he had previously seen a psychiatrist every three months and admitted that medication helped control his hallucinations.  (*Id.*)  But he had not been receiving treatment or taking his medication for at least a year because he could not afford it.  (*Id.*)

Claimant stated that he did not suffer from many "high" manic episodes, but instead that he experiences a deep depression during which he has difficulty getting out

of bed, has suicidal thoughts, and has difficulty maintaining his apartment.  (R. 353-54.)  Those episodes last one or two weeks on average.  (R. 354.)  To prevent suicidal thoughts, Claimant tries to keep his mind distracted.  (*Id.*)  Claimant described two suicide attempts within the last three or four years.  (*Id.*)

On a typical day, Claimant wakes up between 1:00 and 2:00 PM, takes a shower, feeds his pet, and goes to any appointments he may have.  (R. 354.)  If he has no appointments, he keeps himself busy by reading, doing Internet research, exercising, or walking around town.  (R. 354-55.)  Claimant usually does his own cooking, cleaning, and laundry, unless he is in a depressive state and needs assistance.  (R. 355.)  Claimant told Dr. Renzi that he most recently worked as a substitute teacher.  (R. 354.)  He was let go from previous substitute teaching jobs because he made people feel uncomfortable.  (*Id.*)  His longest held position was at a recycling plant for four years.  (*Id.*)

Upon examination, Claimant was alert and appropriately oriented.  (R. 355.)  His mood was serious and his affect congruent.  (R. 356.)  He had no difficulty understanding instructions, though he exhibited a mildly below average concentration level.  (R. 355-56.)  His memory abilities were average.  (*Id.*)  Claimant exhibited a sense of arrogance and entitlement, and was highly defensive.  (R. 356.)

According to Dr. Renzi, there was not enough evidence to suggest bipolar disorder.  (R. 356.)  Instead, she assessed major depressive disorder with psychotic features, and narcissistic personality disorder.  (R. 356-57.)  She identified stressors as financial issues, limited access to health care, and limited social support.  (R. 357.)  His GAF score was documented as 58.  (*Id.*)

On August 3, 2012, Leon Jackson, Ph.D. completed a Psychiatric Review

Technique.  (R. 365-78.)  He acknowledged Dr. Renzi's assessment of major

depressive disorder, severe with psychotic features, and personality disorder with

narcissistic traits.  (R. 368, 372.)  He assessed mild restrictions in activities of daily

living, and moderate limitations maintaining social functioning and concentration,

persistence, or pace.  (R. 375.)

Jackson also completed a Mental Residual Functional Capacity Assessment.  (R.

361-64.)  He found moderate limitations in Claimant's ability to maintain attention and

concentration for extended periods of time; to work in coordination with or proximity to

others without being distracted by them; to complete a normal work-day and work-week

without interruptions from psychologically based symptoms; and to perform at a

consistent pace without an unreasonable number and length of rest periods.  (R. 361-

62.)  He also found Claimant was moderately limited in his ability to accept instructions

and respond appropriately to criticism from supervisors; to get along with coworkers

without distracting them or exhibiting behavioral extremes; and to set realistic goals or

make plans independently of others.  (R. 362.)  In all other categories of functioning,

Jackson found that Claimant was "not significantly limited."  (R. 361-62.)

In the summary portions of his assessments, Jackson reviewed Claimant's

February 2012 ER visit, the consultative examination with Dr. Renzi, and Claimant's

activities of daily living.  (R. 363, 377.)  He found Claimant to be partially credible in light

of the activities he was able to perform.  (R. 377.)  He also concluded that "with

treatment and treatment compliance, improvement could reasonably be expected."  (R.

363.)  It does not appear that the records from Dr. Camilleri were in the file at the time of Jackson's assessment.

### C.    Claimant's Testimony

Claimant appeared at the hearing and testified as follows.  He was 29 years old, single, and lived alone.  (R. 556.)  He completed high school and was one class short of obtaining a Bachelor's degree.  (*Id*.)  Claimant explained that he had difficulty in high school, and eventually completed his degree at an alternative school.  (R. 561.)

Claimant testified that he suffers from bipolar disorder and anxiety and has received treatment since he was nineteen years old.  (R. 560-61.)  He explained that at times he falls into a very deep depressive state, during which he feels an "impending sense of doom."  (R. 562.)  During these times, he feels like no matter how hard he tries, he will never fit in and there is no hope.  (R. 562-63.)  He has suicidal thoughts, often brought on following termination of employment or due to his lack of social skills.  (R. 563.)  His low periods last anywhere from forty-eight hours to three months.  (R. 569.)

In the past, Claimant has worked at a fitness center, a recycling plant and as a substitute teacher.  (R. 565.)  Most recently, Claimant worked as a substitute teacher's aide, usually for two week periods, though he was already having trouble getting along with some of his co-workers.  (R. 557-58, 574.)  According to Claimant, he suffers from hallucinations, even while working, which he tries his best to ignore.  (R. 564.)  His behavior at work, such as fidgeting or talking to himself during hallucinations, always makes others feel uncomfortable.  (R. 567.)  Claimant testified that he has been fired from almost every job, except for the recycling plant job.  (R. 564.)  At the recycling plant, Claimant had a very accommodating boss who allowed him to work through his

frustrations and anxiety in his office.  (R. 566.)  When asked if he would be able to maintain a full-time job, he explained that he could not because it would be too stressful.  (R. 570.)

When Claimant was nineteen, he became eligible for assistive services from the State.  (R. 561.)  His case worker Tamara Watson has been working with him for the past three or four years.  (*Id*.)  As described in more detail below, she assists him with his housecleaning, laundry, medication management and general well-being.  (R. 562.)  She is particularly helpful during his periods of deep depression.  (R. 569.)

When Claimant is not working as a substitute teacher, he likes to read, study baseball statistics, and create journals.  (R. 570-71.)  He tries to keep his mind occupied at all times so he does not fall into a state of depression and increased anxiety.  (R. 571.)  Additionally, Claimant experiences difficulty sleeping, and wakes up three or four times per night because of dreams of real life scenarios that make him uncomfortable.  (R. 572.)  Claimant does not have many friends and does not feel comfortable out in public.  (R. 567-68.)  As a result of his frustrations, he often becomes angry and anxious.  (R. 568.)  He has never hurt anyone, but has kicked walls and doors.  (R. 568-69.)

Claimant testified that although he needs medication and medical care, he is often not able to afford it.  (R. 570.)  He tries to see Dr. Camilleri every few months for prescription refills.  (*Id*.)  He is working on receiving therapy through a local clinic.  (R. 573.)  He also meets with his caseworker once or twice per month.  (R. 573.)

### D.  Case Worker's Testimony

Claimant's case worker Tamara Watson also offered testimony at the hearing.  She has a Bachelor's degree in psychology, one year of work toward a Master's degree

in Social Work, and twenty-five years of experience working with individuals such as Claimant.  (R. 577, 579.)

Watson has known Claimant since November 2009, and usually visits him at least once a month, if not more frequently.  (R. 576.)  Watson meets Claimant at his home or wherever Claimant may request, such as at the Social Security Office or a restaurant.  (*Id.*)  Watson explained that due to his bipolar disorder, Claimant experiences periods of depression followed by periods of mania with hallucinations.  (R. 578.)  She has seen Claimant when he was in a very deep depression.  (*Id.*)  During those times, he may sit in bed for days, and does not clean his apartment, or take care of himself.  (*Id.*)  Watson provides assistance so that Claimant can maintain a sense of routine and consistency.  (*Id.*)  She helps with housekeeping, laundry services, and grocery shopping.  (*Id.*)

Watson testified that Claimant has been let go from his previous jobs because he has difficulty with interpersonal relationships and his reactions are unpredictable.  (R. 579.)  In her experience, the anxiety caused by bipolar disorder can lead to a great deal of stress on the body and will worsen to the point where an individual is no longer able to hold a job, and may end up in an institution.  (*Id.*)  Watson has observed Claimant's anxiety build up and he has expressed difficulty driving or going places.  (R. 579-80.)  According to Watson, every day is a struggle for Claimant.  (*Id.*)

Watson has a great deal of concern for Claimant because his birth mother also suffered from severe bipolar disorder and ultimately took her own life.  (R. 580.)  She hopes to offer continued support to Claimant before his illness spirals out of control and to help him live a comfortable life.  (R. 580-81.)  Although she sometimes recommends

that people can live without assistance after five or ten years, she could not make such a recommendation for Claimant. (R. 581.) When asked if Claimant could maintain a full time job, Watson explained that perhaps if at age nineteen he was provided continued support and accommodations like he was at the recycling plant, he could have maintained a job. (R. 581.) But now, fifteen years later, she did not believe he could work. (*Id.*)

### E. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing. There was no past relevant work for the VE to categorize in this case. (R. 582.) The ALJ first asked the VE to consider a hypothetical individual who could have no contact with the general public, incidental contact with co-workers, and limited contact with supervisors. (*Id.*) The VE testified that such an individual could perform light, unskilled work in positions such as packager, mailroom clerk, or merchandise marker. (*Id.*) When asked if her finding was consistent with the Dictionary of Occupational Titles, the VE explained that the DOT does not address issues such as the amount or type of interaction with people. (R. 582-83.) Instead, he based his conclusion in this respect on his own experience analyzing jobs and placing individuals in positions since 1993. (R. 583.)

The VE further testified that generally an individual needs to be on task a minimum of 85% of the work day in order to sustain competitive work. (R. 583-84.) In manufacturing jobs, such as a packaging job, an individual must be on task 90% of the time in order to maintain production quotas. (R. 584.) Additionally, in unskilled positions, only one absence per month is permissible. (*Id.*) Lastly, the VE testified that

any action that is perceived as abusive or threatening would result in a write up and termination.  (R. 585.)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).  We must consider the entire administrative record, but we will not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner. *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003).  We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  *Id.*  While the ALJ "must build an accurate and logical bridge" from the evidence to his conclusion, he need not discuss every piece of evidence in the record.  *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001).  The ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'"  *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985)).

### B.    Analysis under the Social Security Act

To be entitled to benefits, the claimant must establish that he disabled under the Act. A person is disabled if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter,* 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ applied this five step analysis here. Before doing so, the ALJ noted that Claimant had acquired sufficient quarters of coverage to remain insured through March 31, 2009 (the "date last insured.") At step one, the ALJ found that Claimant had not engaged in any substantial gainful activity since January 8, 2009, the alleged onset date. (R. 17.) At step two, the ALJ concluded that Claimant suffered from the severe impairment of "bipolar disorder with psychotic symptoms." (R. 17.) Next, at step three, the ALJ determined that Claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1.  (R. 18.)

The ALJ went on to assess Claimant's residual functional capacity, concluding that prior to May 23, 2012, he maintained the capacity to perform a full range of work at all exertional levels, "but was limited to simple, unskilled, 1-3 step work tasks, could tolerate only incidental contact with coworkers and supervisors, and could not tolerate any contact with the general public."  (R. 18-21.)  However, the ALJ concluded that beginning on May 23, 2012, although Claimant could still perform work at all exertional levels, he was unable to complete a normal workweek without interruption from psychological symptoms, and was unable to interact with supervisors, coworkers, or the general public.  (R. 21-22.)

At step four, the ALJ determined that Claimant did not have any past relevant work experience.  (R. 22.)  At step five, based on Claimant's age, education, experience and RFC, the ALJ found that prior to May 23, 2012, there were jobs that existed in significant numbers in the national economy that Claimant could have performed.  (R. 22-23.)  But, the ALJ went on to find that no jobs existed that Claimant could perform after May 23, 2012 in light of his non-exertional limitations discussed above.  (R. 23.)  Therefore, as it relates to his application for period of disability and disability insurance benefits, the ALJ concluded that, Claimant was not under a disability through the date last insured of March 31, 2009.  (R. 24.)  As for his application for SSI, the ALJ concluded that Claimant became disabled as of May 23, 2012.  (*Id.*)  The ALJ noted some medical improvement with treatment and recommended a continuing disability review in 24 months.  (*Id.*)

**C.    The ALJ's Conclusion that Claimant was not Disabled from his Alleged Onset Date of January 8, 2009 through May 23, 2012 is not**

**Supported by Substantial Evidence.**

As the Commissioner properly points out, because the ALJ found Claimant disabled as of May 23, 2012, at issue here is the ALJ's conclusion that Claimant was not disabled prior to that date. On this issue, Claimant argues that the ALJ failed to make a proper step three listing determination, and failed to properly assess his RFC and credibility prior to May 23, 2012. We agree, at least in part.

At the outset, we find no reversible error in the ALJ's finding at step three. Again, at this step, the ALJ is tasked with determining whether a claimant meets or equals a listed impairment that the Commissioner has determined to be conclusively disabling. 20 C.F.R. §§ 404.1525(a), 416.925(a). The purpose of the Commissioner's listings is to "streamline[] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background." *Bowen v. Yuckert*, 482 U.S. 137, 153, 107 S. Ct. 2287, 2297, 96 L. Ed. 2d 119 (1987). A claimant must meet all of the specified medical criteria of a particular listing to be considered disabled at step three. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). The claimant bears the burden of proving that his condition meets or equals a listed impairment. *Id.*

Here, though the ALJ's step three analysis was certainly cursory, Claimant's arguments as to why the ALJ erred at this step are without merit. First, the Claimant argues that the ALJ skipped to the "B" criteria of Listing 12.04 (Affective Disorders), without addressing the "A" criteria. But as the Commissioner argues, a Claimant must meet both the "A" and "B" criteria to meet Listing 12.04 and the ALJ concluded that he did not meet the "B" criteria. More importantly, Claimant makes nothing more than

conclusory points on this issue and fails to cite to any specific evidence illustrating why

he satisfies the "A" or "B" criteria of Listing 12.04. Similarly, while Claimant argues that

the ALJ should have considered Listings 12.06 (Anxiety Related Disorders) and 12.08

(Personality Disorders), he simply states that "there is ample evidence in the record" to

warrant an assessment of those listings. He offers no specific examples of such

evidence. Having fully reviewed the record, we find that any shortcomings in the ALJ's

analysis at step three amount to harmless error.

We do not reach the same conclusion with respect to the ALJ's RFC and

credibility assessments. Again, the ALJ determined that prior to May 23, 2012,

Claimant had the RFC to perform a full range of work at all exertional levels, "but was

limited to simple, unskilled, 1-3 step work tasks, could tolerate only incidental contact

with coworkers and supervisors, and could not tolerate any contact with the general

public." (R. 18.) He found that the overall evidence of record "did not corroborate

claimant's allegations and testimony concerning the intensity and limiting effect of his

symptoms." (R. 21.) In our view, these conclusions were not supported by substantial

evidence and the ALJ has failed to build a logical bridge from the evidence to his

conclusions.

The RFC is the most a claimant can still do despite his limitations. 20 C.F.R. §§

404.1545(a), 416.945(a). In making the RFC determination, the ALJ will consider all of

the relevant medical and other evidence in the record, including evidence of

impairments that are not severe. *Id*; *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

The RFC assessment must contain a narrative discussion describing how the evidence

supports the ALJ's conclusions and explaining why any medical source opinion was not

adopted if the ALJ's RFC assessment conflicts with such an opinion. SSR 96-8p, 1996 WL 374184, at **5, 7; accord *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). A court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review." *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (citing *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)). "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Arnett*, 676 F.3d at 592.

The ALJ's shortcomings in his RFC and credibility assessments are obvious here. Perhaps most glaring is the ALJ's repeated reliance on Claimant's "conservative," "limited," and "sporadic" treatment in discrediting Claimant's allegations, as well as Dr. Camilleri's opinion. (R. 19, 21.) Though "infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding," the ALJ "must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft,* 539 F.3d at 679. Here, the record is full of notations that Claimant could not always afford treatment or his medication. Yet the ALJ failed to consider that evidence when discrediting Claimant's allegations and Dr. Camilleri's opinion due to a limited treatment record.

The ALJ also placed stock in the fact that Claimant often failed to take his medication, despite his own admissions that the medication helped his symptoms. In the ALJ's opinion, Claimant's symptoms were controlled with medication and treatment. But as the Seventh Circuit has noted, "the very nature of bipolar disorder is that people

with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). What is more, there is evidence in the record that, at times, Claimant felt like he no longer needed to take his medication. This too can be a hallmark symptom of bipolar patients that the ALJ should have considered. *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) ("ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference.")

In determining what Claimant could do prior to May 23, 2012, the ALJ also took issue with what he viewed as a lack of objective medical evidence supporting disabling limitations prior to that date. Specifically, he declined to find that Dr. Camilleri's 2012 and 2013 opinions had any retroactive application. He cited to the October 2012 letter from Dr. Camilleri, in which she indicated that "at this point" Claimant could not work. According to the ALJ, this statement meant that Dr. Camilleri's letter "did not indicate any retroactive application" and suggested that Claimant's "symptoms only reached a disabling level at the time she authored her opinion." (R. 20.) But what Dr. Camilleri actually stated was that, "At this point I feel you *have had* fairly chronic symptoms." (R. 533.) In its entirety, Dr. Camilleri's statement does in fact suggest that her opinion may be retroactive. On remand, the ALJ should follow-up with Dr. Camilleri, who had been treating Claimant for almost ten years, for further information.

Lastly, the ALJ afforded the opinion of the State agency medical consultant Dr. Jackson "great weight" because he had "reviewed the majority of the documentary

record, properly considered the objective evidence, and reached an opinion consistent with the overall evidence of record." (R. 21.) But Dr. Jackson offered his opinion without having reviewed treatment records or medical source statements from Dr. Camilleri, who, as mentioned above, may shed some light on the retroactive application of Claimant's limitations. All of these errors leave us without a logical bridge from the evidence to the ALJ's conclusion. Remand is appropriate for further assessment of Claimant's RFC and credibility.

## III.     CONCLUSION

For the reasons set forth above, Claimant's motion for summary judgment is granted in part and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for proceedings consistent with this Opinion. It is so ordered.


**ENTERED:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: February 17, 2016**